UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x
                                 :
UNITED STATES OF AMERICA         :     **SEALED**
                                 :     **INDICTMENT**
         -v-                     :
                                 :     14 Cr.
PED ABGHARI,                     :
    a/k/a "Ted Allen,"           :
DIONYSIUS FIUMANO,               :
    a/k/a "D," and               :
JUSTIN ROMANO,                   :
                                 :
         Defendants.             :
                                 :
- - - - - - - - - - - - - - - - x



14 CRIM 518

## COUNT ONE

(Conspiracy To Commit Wire Fraud)

The Grand Jury charges:

Relevant Persons and Entities

1. At all times relevant to this Indictment, a particular company (the "Telemarking Firm") was located in Irvine, California, and purported to offer mortgage modification services to homeowners throughout the United States who were in danger of losing their homes because they could not afford to pay their residential mortgages.

2. At all times relevant to this Indictment, PED ABGHARI, a/k/a "Ted Allen," the defendant, and a co-conspirator not named as a defendant herein ("CC-1"), held themselves out as the presidents and owners of the Telemarketing Firm.

1



3.  At all times relevant to this Indictment, DIONYSIUS FIUMANO, a/k/a "D," the defendant, held himself out as a senior manager of the Telemarketing Firm, and was directly responsible for training and overseeing the Firm's telemarketers and salespeople (the "Sales Staff").

4.  At various times relevant to this Indictment, Company-1 and Company-2 (collectively, the "Purported Law Firms") were purported law firms based in Holbrook, New York, and Sayville, New York, respectively, which offered purported mortgage modification services in conjunction with the Telemarketing Firm.

5.  At all times relevant to this Indictment, JUSTIN ROMANO, the defendant, held himself out as the President of Company-1 and Company-2.

### The Home Affordable Modification Program

6.  As a result of the financial crisis and collapse of the housing bubble in 2008, Congress enacted the Home Affordable Modification Program ("HAMP"), which was to be funded through the Troubled Asset Relief Program ("TARP"). HAMP permits qualified home owners to obtain mortgage relief. Specifically, HAMP seeks to prevent foreclosure by modifying troubled loans to achieve monthly payments the homeowner can afford.

7.  Pursuant to HAMP, any homeowner may apply to his or her mortgage provider by completing a short form and submitting it,

along with supporting paperwork, to the homeowner's mortgage provider. HAMP further sets guidelines for lenders to follow in determining eligibility, such as guidelines based on the homeowner's income and the principal balance remaining on the mortgage. Pursuant to HAMP, only a homeowner's lender may determine the homeowner's eligibility for a modification and, if appropriate, the modified rate and monthly payment for which the homeowner is eligible.

8. HAMP applications are readily available online as well as in many local banks. Submitting an application is, by law, free of charge to the homeowner. Virtually all mortgage providers are required to participate in the HAMP program and accept HAMP applications.

9. If a HAMP applicant is approved, he or she receives a reduced monthly mortgage payment set by the lender. If the HAMP applicant is not eligible for a modification, the application may be rejected. Common reasons for rejection of a HAMP application include that the homeowner earns too much income to qualify or has not demonstrated sufficient financial hardship or need for a modification.

## The Scheme To Defraud

10. From at least in or about January 2011 through in or about May 2014, through the Telemarketing Firm and the Purported Law Firms, PED ABGHARI, a/k/a "Ted Allen," DIONYSIUS FIUMANO, a/k/a "D,"

3

and JUSTIN ROMANO, the defendants, and others known and unknown, perpetrated a scheme to defraud homeowners in dire financial straits who were seeking relief through HAMP and other mortgage relief programs. Through a series of false and fraudulent representations, as set forth below, the defendants duped thousands of homeowners into paying thousands of dollars each in up-front fees in exchange for little or no service from the defendants or their companies. In total, through their scheme, the defendants obtained over $18.5 million from more than 8,000 victim-homeowners throughout the United States.

## Means and Methods of the Conspiracy

4. In furtherance of the scheme, through the Telemarketing Firm, PED ABGHARI, a/k/a "Ted Allen," and DIONYSIUS FIUMANO, a/k/a "D," the defendants, and others known and unknown, purchased thousands of "leads," consisting of the name, address, and other contact information of homeowners who had fallen behind in making mortgage payments on their home.

5. Also in furtherance of the scheme, PED ABGHARI, a/k/a "Ted Allen," and DIONYSIUS FIUMANO, a/k/a "D," the defendants, and others known and unknown, caused the Telemarketing Firm to send, by e-mail, false and fraudulent solicitation letters to the homeowners they identified through the "leads" described above, misleading these homeowners into believing that their mortgages were

4

already under review and that new, modified rates had already been contemplated and approved by the homeowners' lenders. For example, in one fraudulent solicitation commonly transmitted via e-mail by the Telemarketing Firm, the defendants told homeowners that their loans were already under review and that they "pre-qualify for assistance and have been assigned to a housing counselor." The same solicitation told homeowners that "under H.A.M.P. guidelines" the modified "interest rates are between 2% - 4.25%," and directed the homeowners to contact the Telemarketing Firm via a toll-free number, adding that the "offer" would expire in "10 business days."

      6.    Also in furtherance of the scheme, PED ABGHARI, a/k/a "Ted Allen," DIONYSIUS FIUMANO, a/k/a "D," and JUSTIN ROMANO, the defendants, and others known and unknown, caused the Telemarketing Firm to employ telemarketers (the "Sales Staff") who, at the defendants' direction, called homeowners and/or answered telephone calls from homeowners who received the Telemarketing Firm's fraudulent solicitations. During these calls, in an effort to convince the homeowners to pay up-front fees, ABGHARI, FIUMANO, and ROMANO, through the Sales Staff, regularly caused various false and fraudulent representations to be made to homeowners, including that (a) the homeowners were retaining a "law firm" and an "attorney" who would complete the HAMP application and negotiate aggressively on the homeowners' behalf with banks to modify the terms of the

5

homeowners' mortgages; (b) the defendants would "pre-approve" the homeowners for a guaranteed modification through HAMP; (c) the defendants employed underwriters who would calculate and guarantee the homeowners a new, modified rate and monthly mortgage payment; and (d) the defendants' mortgage modification services were free, and the up-front fees paid by the homeowners would be paid directly to the homeowners' lenders.

       7.    In truth and in fact, and as PED ABGHARI, a/k/a "Ted Allen," DIONYSIUS FIUMANO, a/k/a "D," and JUSTIN ROMANO, the defendants, well knew, all of these representations were false and fraudulent. As the defendants knew, neither they nor any of their employees could pre-approve the homeowners or guarantee any of the homeowners a mortgage modification or new monthly payment. Furthermore, not only were the defendants' "services" not free, the defendants kept all of the fees paid by the homeowners, and paid none of it to the homeowners' lenders. Furthermore, as the defendants knew, neither the Telemarketing Firm nor the Purported Law Firms provided the homeowners with an attorney or any sort of legal assistance, and they frequently did little more than complete the Government-sponsored HAMP application which, as noted above, the homeowners could have obtained and completed on their own, free of charge. In some cases, as the volume of homeowners paying thousands of dollars to "retain" the defendants' services swelled, the

defendants and their employees did nothing at all in exchange for the money they received from homeowners.

8. To encourage the Telemarketing Firm's Sales Staff to obtain new clients, and thus additional up-front fees of thousands of dollars per client, PED ABGHARI, a/k/a "Ted Allen," the defendant, and CC-1, paid each salesperson a commission upon the Telemarketing firm's receipt of an up-front fee from that particular salesperson's client. They did so even in the face of an increasing volume of complaints from homeowners to ABGHARI, CC-1, and DIONYSIUS FIUMANO, a/k/a "D," the defendant, among others known and known, that the homeowners had been misled by the Telemarketing Firm's salespeople into paying the up-front fees under false pretenses. In fact, for a substantial portion of the relevant time period, the Telemarketing Firm's salespeople were paid exclusively based on commissions taken from the up-front fees paid by homeowners.

9. In furtherance of the scheme, once homeowners were duped into paying up-front fees to the Telemarketing Firm through the series of fraudulent representations described above, at the direction of PED ABGHARI, a/k/a "Ted Allen," and DIONYSIUS FIUMANO, a/k/a "D," the defendants, the homeowners were referred to one of the Purported Law Firms and directed to make payments - generally in three, equal amounts - directly to that Purported Law Firm via electronic transfers to bank accounts under the control of JUSTIN

7

ROMANO, the defendant. Upon receipt of the homeowners' payments, ROMANO transferred approximately three-quarters of the payments back to the Telemarketing Firm as its share of the fraudulently obtained proceeds.

    10. In furtherance of the scheme to defraud, JUSTIN ROMANO, the defendant, and others known and unknown, caused the Purported Law Firms each to employ just one attorney, who had no role in seeking mortgage modifications on behalf of customers recruited by the Telemarketing Firm and little, if any, knowledge of or contact with any of the homeowners who believed they had retained an attorney to pursue their modification.

    11. As a further part of the scheme to defraud, JUSTIN ROMANO, the defendant, and others known and unknown, caused the Purported Law Firms to employ "processors" who were not attorneys and had little, if any, training or experience in handling mortgage modification applications or in negotiating with lenders regarding such applications. In fact, the processors employed by the Purported Law Firms generally did no more than complete the simple, free HAMP application based on information provided by the homeowner. In numerous cases, as noted above, as the number of homeowners retaining the Purported Law Firms swelled and the processors fell behind in completing applications, the processors did nothing at all

on the homeowners' behalf while the defendants nonetheless collected fees from the homeowners.

        12. As a further part of the scheme to defraud, JUSTIN ROMANO, the defendant, and others known and unknown, caused Company-1 to make additional fraudulent representations to homeowners who had already been duped into making a series of payments to Company-1 under false pretenses. For example, as part of the scheme to defraud, ROMANO caused Company-1 employees to make phone calls to the homeowners - called "welcome calls" - in which many of the false and fraudulent representations previously made by the Telemarketing Firm's Sales Staff were reinforced. During these calls, which followed a script prepared by ROMANO, Company-1 employees told homeowners, among other things or in part, that their files had arrived and were going to be "transfer[red] . . . to one of our attorney's [sic] for further review." Similarly, on or about April 25, 2012, ROMANO instructed a Company-1 employee by e-mail, in relevant part, that, "[o]n welcome calls, if a client asks if we have done anything. [sic] Just let them know the attorney has done a review of the docs which we have. . . . I want them to feel that we have reviewed stuff and done something prior to the call." In truth and in fact, as noted above and as ROMANO well knew, the single attorney employed by Company-1 had no role in reviewing any of the paperwork or information submitted by homeowners. Indeed, on or about July

25, 2012, ROMANO sent an e-mail to DIONYSIUS FIUMANO, a/k/a "D," the defendant, regarding an upcoming meeting with the Telemarketing Firm's Sales Staff in which he stated, "In meeting I am going to say that [the attorney employed by Company-1] does look over every case after we review, just because we never know what sales people will say if [they know] an attorney is not reviewing every file." Shortly thereafter, FIUMANO responded: "Good idea."

13. In furtherance of the scheme, as customer complaints about the Telemarketing Firm and Company-1 mounted, PED ABGHARI, a/k/a "Ted Allen," CC-1, DIONYSIUS FIUMANO, a/k/a "D," and JUSTIN ROMANO, the defendants, and others known and unknown, sought to cover up their fraudulent scheme by changing the names of both the Telemarketing Firm and Company-1. For example, on or about July 24, 2012, ABGHARI sent an e-mail to FIUMANO and ROMANO, among others, copying CC-1, with subject line "ANOTHER MISTAKE - [Company-1's new name] vs [Company-1]." Addressing ROMANO and the Company-1 staff in particular, ABGAHRI wrote: "Can you guys go around your processors desks and make sure they NO longer have anything that says [Company-1]. Only one client needs to put the pieces together than [sic] our laundry is hung all over the internet on Ripoff-reports. We cannot risk exposing the [new Company-1 name] and [new name of the Telemarketing Firm] names to past clients."

14. The same day, on or about July 24, 2012, JUSTIN ROMANO, the defendant, sent an e-mail to DIONYSIUS FIUMANO, a/k/a "D," the defendant, copying PED ABGHARI, a/k/a "Ted Allen," the defendant, and others, in which he wrote, "The main recordings have all been redone to a generic Main voicemail which says (our law firm). 3 different voices. So if a number is given out by accident, they will never know the firm they are calling."

15. Similarly, on or about August 1, 2012, PED ABGHARI, a/k/a "Ted Allen," the defendant, sent an e-mail to various individuals at Company-1 regarding complaints about false and fraudulent sales pitches: "[Y]our [sic] more than welcome to get with [DIONYSIUS FIUMANO, a/k/a "D," the defendant] regarding any sales pitches, but it won't provide the answer you're looking for. The main reason we're being slammed . . . is because we waited too long to change names. I normally change names every 9 months to keep things cool and have all agencies off our backs. Within the next month or so you'll see a major slow down on complaints because we no longer do business under [the name of Company-1] or [the name of the Telemarketing Firm]."

Statutory Allegations

16. From at least in or about January 2011 through in or about May 2014, in the Southern District of New York and elsewhere, PED ABGHARI, a/k/a "Ted Allen," DIONYSIUS FIUMANO, a/k/a "D," and

11

JUSTIN ROMANO, the defendants, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit an offense against the United States, to wit, wire fraud, in violation of Title 18, United States Code, Section 1343.

17. It was a part and an object of the conspiracy that PED ABGHARI, a/k/a "Ted Allen," DIONYSIUS FIUMANO, a/k/a "D," and JUSTIN ROMANO, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

### Overt Acts

18. In furtherance of the conspiracy and to effect its illegal object, PED ABGHARI, a/k/a "Ted Allen," DIONYSIUS FIUMANO, a/k/a "D," and JUSTIN ROMANO, the defendants, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

        a.    On or about October 18, 2011, a homeowner located in the Bronx, New York wired $1,250 to a bank account controlled by ROMANO as partial payment for purported mortgage modification services offered by the Telemarketing Firm and Company-1.

        b.    On or about February 10, 2012 a homeowner located in the Bronx, New York wired $1,250 to a bank account controlled by ROMANO as partial payment for purported mortgage modification services offered by the Telemarketing Firm and Company-1.

        c.    On or about January 15, 2013, a homeowner located in the Bronx, New York wired $926 to a bank account controlled by ROMANO as a partial payment for mortgage modification services offered by the Telemarketing Firm and Company-1, which at the time was operating under a new name.

        (Title 18, United States Code, Section 1349.)

## COUNT TWO

### (Wire Fraud)

The Grand Jury further charges:

19.    The allegations contained in paragraphs 1 through 15 and 18 above are hereby repeated, realleged, and incorporated by reference as if fully set forth herein.

20. From at least in or about January 2011 through in or about May 2014, in the Southern District of New York and elsewhere, PED ABGHARI, a/k/a "Ted Allen," DIONYSIUS FIUMANO, a/k/a "D," and JUSTIN ROMANO, the defendants willfully, and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, ABGHARI, FIUMANO, and ROMANO participated in a scheme to defraud homeowners through the Telemarketing Firm and the Purported Law Firms, among other companies, by causing misrepresentations to be made to homeowners concerning mortgage modification assistance to be provided in exchange for up-front fees and, in the course of executing such scheme, caused numerous phone calls to be made and e-mails to be sent from California and New York to victims located throughout the country.

(Title 18, United States Code, Sections 1343 and 2.)

### FORFEITURE ALLEGATION

21. As the result of committing the wire fraud offenses, in violation of Title 18, United States Code, Sections 1349 and 1343, alleged in Counts One and Two of this Indictment, PED ABGHARI, a/k/a

14

"Ted Allen," DIONYSIUS FIUMANO, a/k/a "D," and JUSTIN ROMANO, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses, including but not limited to a sum of money representing the amount of proceeds obtained as a result of the offenses charged in Counts One and Two of this Indictment.

### Substitute Asset Provision

22. If any of the above-described forfeitable property, as a result of any act or omission of the defendants,

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property described above.

>(Title 18, United States Code, Section 981(a)(1)(C);
>Title 21, United States Code, Section 853(p);
>and Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
PREET BHARARA /N/
United States Attorney

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v -

PED ABGHARI,
a/k/a "Ted Allen,"
DIONYSIUS FIUMANO,
a/k/a "D," and
JUSTIN ROMANO,

Defendants.

**SEALED INDICTMENT**

14 Cr.

(18 U.S.C. §§ 1343, 1349, and 2.)

PREET BHARARA
United States Attorney.

A TRUE BILL

_____
Foreperson.

2) File Sealed Indictment
   File Arrest warrant